B.P. RE, L.L.C. v. RML Waxahachie Dodge, L.L.C. And Mr. Tarasas, we'll hear from you. Thank you, Your Honor, and may it please the Court, The Banksy Court made a series of fundamental errors that irreparably changed the outcome of the trial and were left uncorrected by the District Court. I would like to focus on four of these today subject to the Court's questions. First, RML Waxahachie Dodge breached the March 20, 2009 lease as a matter of law and the parties signed the contract, but RML Waxahachie Dodge failed to pay rent. Second, no court has yet addressed B.P. RE's claims of torturous interference with existing contracts or conspiracy because the Banksy Court relied on the wrong information. Third, appellees committed fraud when they failed to correct a material representation prior to the signing of the July lease. Finally, there are no strong suspending reasons to deny B.P. RE's request for jury demand. Before I begin, I know that there is a dispute on the standard of review in this case. And while I'm happy to discuss why we believe it's a de novo standard of review, we believe that the errors of the Banksy Court were clear such that that dispute is really immaterial because in either case, reversal is required. In regard to the first issue . . . Could I interrupt? I'm sorry. I just have this question about the jury issue. If there is a . . . if the jury trial issue, if you have properly asserted your right to a jury trial and this court determines that you didn't, obviously you didn't get your jury trial, does that get you all the way home and we just start over if we say that you were entitled to a jury trial? We believe that on the breach of the March lease issue that that's a matter of law issue. It can be decided right away. In terms of all the other issues in the jury trial, yes, it would bring it all back in terms of being redone. And I'd like to point the court to a case cited by Appellees in their brief, which is the Fishback case. And in that case, there was a full trial on the merits of bench trial. And even though the appellant in that case had requested a jury demand four months late and it was inadvertent, the court still said that there was no strong compelling reason to deny the jury demand and therefore sent it all back for a jury trial. But, Your Honor, in terms of your question, the March lease in and of itself, because we're talking just about the contractual language there, that can be a matter of law issue and doesn't need to be tried by the jury. Okay. So with respect to this jury trial issue, as I read the briefs, apparently the local rules there in the court required you to do certain things to sort of invoke your right. Once that time passed, I think it was about two weeks later or some point in time, that's when you specifically made the jury demand. Should the court have considered that? Did you make an official demand through a motion or was it just at the hearing? Or when was that demand made? So, Your Honor, there are several steps in terms of the fact that the court local rules in making the jury demand. The first one is to plead it in the adversary complaint, which we did. Also, we filed a statement regarding consent to jury charge, which was also required, and that's at the very beginning of the case. The deadline that you're talking about is the request for a pretrial conference, and that was supposed to be done by January 30th, and that was the one that was two weeks late. So there was no question that there was a jury demand already made previously. It's just under the local rules. It's the administrative step of requesting a pretrial conference, which the court allowed even in the delay and allowed a brief on the issue itself to be done, and I believe that conference actually occurred on April 12th. You would not have had a pretrial conference absent a jury demand? Apparently not, Your Honor, and I'm not fully fluent in all the bankruptcy court local rules, but that was one of the—to get a pretrial conference, it was part of the reason or could be the sole reason would be for the jury demands. But that pretrial conference was held. I mean, most trials, irrespective of jury, have a pretrial conference. Most courts don't. Yes, Your Honor, and this was just something a little bit different. Okay. So in that regard, once the court did hear the motion, apparently denied your right to a jury trial at some point in time, do you know if the court was relying on, or if you ever made the argument that you're seeking a jury trial under 39 as opposed to Federal Rules of Procedure 38, or because your notice of pretrial—your notice was two weeks late, should the court automatically have considered it under Rule 39 as opposed to Rule 38? Your Honor, we believe that the court should have automatically considered it because of the pretrial conference being—the reason for the pretrial conference being the jury demand, because we had requested a jury demand before the adversary complaint. In addition, the reason for the delay, as we provided in our brief, was that on January 26th, just a few days before, the court had actually taken a misjoined party, BP Automotive, out, which required an amended adversary complaint, which was later filed, and which we again asserted a jury demand on that. Okay, and that amended adversary complaint, any new issues, any new facts, any new things that would trigger something differently? Yes, Your Honor. There is several new claims. Most of the claims, which is part of the issue we have with the bankruptcy court's judgment, was that most of the claims in the original adversary complaint were related solely to BP Automotive as opposed to BPRE, the appellant in this case. And so in the amended adversary complaint, there was probably six new claims for BPRE as opposed to BP Automotive. And so there were several new claims that were put forward as well as, again, reasserting— But those were made timely. What's that, Your Honor? Your amendments were made timely. Yes, Your Honor. Yes, Your Honor. And that was based on the court's allowance of us to amend the adversary complaint. It was past the deadline to amend, but because of the misjoined party that was taken off on January 26th, then the court allowed for the amended complaint. And so in terms of, again, on the March lease issue, the primary question here is when the March lease commenced. And no party contends that the lease itself is ambiguous. The lease says, specifically provides, that the terms shall commence on the date hereof. And as Texas courts have found repeatedly, the date hereof means today's date. In Cal State, the Dorado expiration, the date hereof was the date the agreement was executed, and that there were certain different deadlines that were triggered from that date. Also, the Jefferson Standard case talks about anniversary hereof and specifically says it means annually from now. The lease itself, and I've gone through it several times, does not reference any other contract. It doesn't reference any other requirement before it would commence. It simply says it shall commence on the date hereof. Now that is different from the July lease, for example, which has specific provisions and requirements that have to be completed before the lease becomes effective, and that's to receive approvals from Chrysler or receive approvals from the Texas Motor Vehicle Commission. None of that is present in the March lease. The March lease also has a standard merger clause, which says all previous agreements, all other agreements, are not binding. This is the only agreement related to this subject matter, which is the lease itself. And even if the court were to conclude that the March lease was somehow ambiguous in terms of the date of commencement, the evidence of trial shows that there is no question that the March lease was signed on March 20th and that it should commence immediately. For example, Scott Bosier and Randy Kretzer, both of BPRE, testified at trial that the March lease commenced on the date it was signed and that the rent would start being due immediately. In addition, RMO Aksachi Dodge immediately represented to Chrysler and provided Chrysler with what it called a valid and binding lease. And appellees admitted in their joint pretrial order that this representation was made to Chrysler and that Chrysler relied on this representation, that it was a valid and binding lease in order to process an application for a Dodge Chrysler and Jeep dealership. In addition, RMO Aksachi Dodge explained at trial, Paul Hart being one of its representatives, that as soon as the lease was signed, BPRE could not have sought another tenant. And that's on the designated record page 1994. He says when this lease was entered into, at that point, I'm not aware that they could find another tenant. How much money were you talking about for this lease? I mean, I thought it was just for a month or two months. 26,000 a month. 26,000 a month for one year? Yes, Your Honor. Your Honor, on the second issue, appellees do not contest that no court has yet ruled on BPRE's claims for tortious interference with the existing contract or conspiracy. On designated record on page 1714, the bank sheet court specifically said, Judge Acknard overlooked the fact that BPRE had filed an amended complaint. So no court has yet analyzed or made any determinations on those issues. Instead, what the bankruptcy court did repeatedly is that it said that these claims belong to BP Automotive using the superseded original adversary complaint. And thus, it's not going to make any factual findings. Your Honor, on the third issue, appellees committed fraud when they made a material representation that they would provide an application to the Texas Motor Vehicle Commission immediately after the July lease was signed. Appellees do not contest MCN Energy's Texas Court of Appeals in Fort Worth when it says that when one makes a representation to another that later becomes false, he has a duty to correct the false information. Here, appellees represented on three separate occasions, on July 14th, July 16th, and July 17th, that it had all the approvals it needed from Chrysler and that the only thing holding it up from submitting an application to the Texas Motor Vehicle Commission was a signing of the July lease. At trial, the evidence – excuse me – the testimony of Paul Hart was that he received a call sometime around July 17th from Chrysler sometime between the 15th and the 17th from Chrysler that said, we can't go forward to the Texas Motor Vehicle Commission because Chrysler no longer is giving its approval. But they never – the testimony at trial is consistent. They never told BPRE about this. And that was a very material term because, again, in the July lease, section 2.3, it specifically says that they have to get approval from the Texas Motor Vehicle Commission before they can – before the lease would commence. It's commenced three business days after they received that approval. And so this was a very material term that was relied on. The testimony was that it was relied on by BPRE and that BPRE actually turned down another prospective tenant based on these representations that RML Waxhatchee Dodd was going to move forward with the Texas Motor Vehicle Commission. And I'd like to point out just in the – the bankruptcy court relied on this issue on a document. It's the – in the designated record, it's Exhibit D, Defendants 25, in an email on July 2nd, two weeks before these representations had occurred. But even in that exhibit, it specifically says that this issue, if there is any issue at all, would only take somewhere between a few days and a couple weeks to resolve, which is completely in line with the timeline. In that July 2nd, there were some problems with Chrysler, but then on July 14th, 16th, and 17th, there's representation saying, hey, we're good to go. We can go to the Texas Motor Vehicle Commission immediately. And that would be right in line with the issues that Chrysler might have been having on July 2nd, but having those being fixed before they had to sign the July release. Your Honor, in terms of the jury demand itself, I don't think there's any question here that these are the types of claims that would normally go to a jury. They are state court claims that are normally tried to a jury based on the fact that they're seeking monetary damage to augment the bankruptcy estate. Also, as we talked about before, EPRE gave repeated notice to appellees that are seeking a jury demand to the court. There is no prejudice here at all because everyone knew based on just looking at the original adversary complaint, looking at the amended adversary complaint, and the numerous different filings and statements made during hearings that EPRE was requesting a jury demand. Everyone knew that a jury was requested, and it wouldn't have slowed anything in the trial process. Appellees have made no arguments that there's any strong and compelling reason to deny such a jury demand. And that is something that the United States Supreme Court and this court has held to be very, very important and fundamental in any sort of trial, which again is why in the Fishback case, even though there was a full trial, bench trial, the court said that we have to go back and redo this. Because you improperly denied the jury demand. I think in my research on the issue, I found a case where someone sought, and I'm not even sure if it's available to a deprived party now, an interlocutory appeal on that very issue. Did you all think about or could you have done that with respect to being deprived of your right to a jury trial? Yes, Your Honor, and we looked into that issue, and what we found is that that wouldn't have been right at the time for an interlocutory appeal, which is why we did not appeal at the time. We did consider it, and we did not move forward because of that case law from the circuit. Because now you've gone through a full trial, the expense of a full trial, the court has weighed all the evidence, made findings, two courts have, and it seems counterproductive now to go back and retry the case again. Yes, Your Honor, we definitely understand that, and that's why we're a little surprised to find that it wouldn't be right for appeal at that time for an interlocutory type appeal. In terms of the, when you talk about weighing the evidence, I just want to, another issue, Your Honor, is that the Bankruptcy Court relied on evidence that was not in the record. And even when this case went back down from this court, back down to the district court, that evidence wasn't in the record for the district court to review, because it wasn't part of the designated record, which simply asked for exhibits that had been admitted. And so there's several factual findings that were made based on deposition transcripts, particularly the Hart deposition transcript. But the defendant, I mean, yeah, the defendant here argues that that deposition testimony was basically consistent with the trial testimony, so therefore, if there was an error, it was harmless. And, Your Honor, we disagree with that, and I see my time is about to end, but if you don't mind, may I finish the question? Your Honor, we believe that is absolutely wrong. There are numerous discrepancies between Mr. Hart's trial testimony and what he testified to during his deposition. Let me just point out two of those. One is that he said at trial— You've got about 30 seconds. Yes, Your Honor. The March lease very clearly states it would start upon the commencement of the date stated in the lease. And he could point to no part of the March lease that referenced the asset purchase agreement. But the bankruptcy court relied on his deposition testimony to say that the March lease had to begin when the asset purchase agreement closed. He was very inconsistent there. The second one is that he testified at trial that he wasn't aware of the exact date that the March lease was signed. But the bankruptcy court relied on the Hart deposition transcript to conclude that the March lease was signed about the same time as the asset purchase agreement. So those are just two of several different examples where it's inconsistent. Okay. Thank you, Mr. DeRozas. Mr. Page representing Waxhacks. Dodge. Good morning. Good morning. May it please the Court. This case has been before a panel of the Fifth Circuit previously after an appeal from the district court when it affirmed a judgment entered by the bankruptcy court. In the previous appeal, a panel of this court reversed and found that the judgment of the bankruptcy court was not consistent with Article III of the Constitution under the Stern v. Marshall principle. And accordingly, the case was remanded to the district court for appropriate action. On remand, the district court reviewed the file, reviewed the case, and adopted the recommendations, recast as recommendations, the findings and conclusions of the bankruptcy court and entered its own judgment. That's significant because what's before the court today is essentially a challenge to factual findings which have been adopted by the district court. And on review in this court, the standard of review is for clear error. And that's contrary to what the appellant admits even in oral argument is what he said in his brief where he relied rather on a different standard of review as if this court were reviewing recommendations. We think it was entirely proper in terms of how the district court handled that. The reply brief asserts for the first time that it would have been better and more consistent with the Fifth Circuit's decision in the first appeal for the case to have been remanded to the bankruptcy court for a new trial, which is what the appellant asked for at the district court level. That was not adopted, and we think that was entirely appropriate because the first decision of this court did not require or even suggest that a remand to the bankruptcy court was required. Also because the standing order of the Western District of Texas since 2013, post Stern v. Marshall, has made it very clear that a district court has the discretion to treat a judgment from a bankruptcy court as proposed findings and conclusions, if appropriate in the circumstances, which it clearly was here. And finally, in a subsequent case after the briefing here, in the case Inouye v. Galas in August of 2014, another panel of the Fifth Circuit essentially citing our first case here adopted the same procedure, saying that a district court has complete discretion to decide what to do on remanding. So let's turn to those facts on remand, and in particular I want to address the points that are raised by the appellant in oral argument. And I think our position on these facts, and there's a myriad of them, is that they are amply supported under the record in its entirety, that there is a basis for every conclusion, and that the standard of our view is not whether this court would look at it differently, but whether there is a plausible basis in the record to support those findings. With respect to the March lease, we have a very divergent view of what the facts are. Mr. Tiresias, in his argument, says that the lease was to begin on the date hereof, overlooking to tell you, and the record is clear on this, that the date on the first page of the lease was left blank. It was left blank because it was an attachment as an exhibit to an asset purchase agreement. This was originally a transaction whereby the BP Automotive dealership was to be sold to the RML dealers, who, by the way, were their next door neighbors. I've not been to Waxhatchee, but I understand there are three dealerships on the highway, and the dealership of the BP Automotive was in the middle between two dealerships owned by RML. When RML had financial trouble, which is what the courts below found, they approached their neighbors about selling their dealership. It was an asset purchase agreement, and the lease was to be effective upon the completion of the asset purchases, which was the transfer of the dealership and the franchise from Chrysler. So this lease was contingent in its entirety on the APA, the asset purchase agreement, closing, and those were the findings of the courts, multiple judges below. So it is simply – it is completely erroneous to say that as a matter of law, this lease became effective on March 20th. Let me point to a couple of other facts in the record that completely undermine that. BP Automotive stayed in business after the asset purchase agreement and the lease. They were – what was to be acquired by RML was an ongoing dealership. But on May 1st, which is after this lease, BP Automotive closed its doors and went out of business. That's a finding of fact in the courts below. Now today, under the appellant's interpretation of the lease, presumably for the month of April, part of March and all of April, while BP Automotive was in the premises operating their business, the rent was supposed to be paid by RML. And that's nonsense. The rent was to be paid by RML only after the dealership was taken over in due course with approval from Chrysler, and that didn't happen. Chrysler filed bankruptcy on April 30th. BP Automotive was already in financial trouble. It went out of business on May 1st. Those are findings below. RML tried very hard to keep the deal alive. Among the things they did was move into the premises with consent. In fact, the keys were handed over by Mr. Pretzer, who is the BP principal, so that the premises could be used. What we meet in the trial, of course, is a claim of trespass that our clients went in without permission. But in fact they were invited in, they paid the utilities, cut the grass, installed a computer system, and were working toward getting the deal done. It was, in fact, a breach of the asset purchase agreement for them to go out of business and fail. And obviously because of that and because of what happened at Chrysler, what ultimately happened here was not the deal originally intended. And by July, they rewrote the lease, rewrote the deal so that the lease was now specifically effective upon the approval by Chrysler. And that was a circumstance that hadn't existed in March. That had happened on March 20. Chrysler was still viable. Are you tracking the opinion of the district court? I am. I should point out there are multiple judges in this case. Judge King, in the bankruptcy court, entered summary judgment, and in the course of doing that laid out a series of facts, which he found for purposes of summary judgment. No appeal was taken from that summary judgment. He dismissed certain counts, but he found facts. One of them, for example, is BP Real Estate, BPRE, the party in bankruptcy and the plaintiff or the appellate here, was not a party to any Chrysler agreements. That's very important when we talk about the tortious interference with contract claim, which I think is the next item. The appellate says here no judge looked at that. That's simply not true. Judge Smith and the district court have reviewed that and pointed out that there had been amendments to those counts in the amended complaint. The problem with it, and this is what Judge Smith said in his opinion. The problem was that even as amended, the tortious interference count continued to be based upon interference with the franchise agreement. It was the alleged interference with the Chrysler relationship with BP that was the contract tortiously interfered with, and the complaint said there were damages as a result to BPRE, which is the real estate entity that had no contract. The judge dismissed that and said the tortious interference count belongs to BP Automotive. So it is not correct that nothing was said below. It's simply that the court rejected the idea that there could be a case for BPRE with respect to its lease, which only has one contracting party. That's its entity under common ownership, BP Automotive, and there's no allegation that the lease was tortiously interfered with or that the lease was breached in some way. Remember this about the franchise agreement. It's in the findings of fact that when Chrysler terminated, withdrew, that is to say rejected in bankruptcy, the franchise agreement for BP Automotive, that occurred in mid-May, two weeks after they had closed their doors. BP Automotive took no steps to contest that. There is a provision in their franchise agreement for arbitration. They didn't do that. They didn't do anything. They simply closed their tent and went home and left RML trying to resurrect some form of a deal, which eventually it did. Now, the theory that I think the appellants have proceeded on a trot is essentially along those lines. We will claim the March lease was effective, even though clearly in context it was contingent. And then we will say that the July lease, which replaced it, is ineffective because it was fraudulently induced. Their theory holds together if you get both pieces of it. You can say the March lease was valid and the July lease was a trick and we shouldn't have signed it and we didn't have to sign it. The problem is that the courts below found that the situation with Chrysler at that time was in flux and there were a lot of changes taking place. The Chrysler entity actually granted the right to RML to have a Dodge Chrysler Jeep franchise in early July. That's clear. The representative of Chrysler's testimony was available to the judge, and that was granted. The problem that developed was that the new entity that emerged from bankruptcy in Chrysler, and they referred to it in the record as new Chrysler, as old Chrysler or new Chrysler, new Chrysler wasn't qualified to do business in the state of Texas. So even though new Chrysler started making decisions about franchises, the state agency in Texas that would approve that, the commission that would grant that, would not recognize new Chrysler until it qualified to do business in the state of Texas. That was a circumstance beyond the control of these parties. It was a circumstance that wasn't a secret. The premise of the fraudulent inducement count is that somehow something happened and RML didn't tell them about it at the point they were signing the lease. What that was about was the fact that new Chrysler was not yet qualified in the state of Texas. And the judge below found, the judges below found, RML was working in good faith to try to get the thing done as quickly as possible. The testimony was that new Chrysler did not become qualified until the fall of 2009. And so there was a substantial delay. It wasn't the fault of RML. And RML didn't do anything fraudulently, didn't conceal facts that were material to this party, to BP Automotive and to BP RE. So we think that when you look at all of the records and you understand what the full case is about and don't selectively pick out pieces of the record, you can see that there is complete support for the record in this case. Let me talk a little bit about the jury trial issue. And I do think there's one point that I would add to the chronology that was discussed with counsel a minute ago. The appellant did contest the denial of the jury right at the time the bankruptcy court said you'd waived it. And here's what the appellant did. The appellant tried to withdraw the reference to the bankruptcy court. And it went to the district court and argued that it should be entitled to a jury trial. And if we can't get it there, we want to withdraw the reference and have a trial elsewhere in the district court. And that was rejected by the district court. And the district court said this is gamesmanship and you're just playing with the rules and we're not going to permit that. When did you, your client, learn that the appellant had requested a jury trial? When did you first learn? So the original complaint, I think, did say on a space jury trial requested. I'm paraphrasing because I don't remember the word. It is true, then, as was represented, that there were statements from the beginning we would like to have a jury trial. The rules of the court, however, are a little more specific when it comes to the scheduling order. And there were two deadlines that were missed by BPRE at that time. One was a deadline that had to do with the scheduling order itself, and they missed that by about two weeks. And then secondly, by a longer period, they missed the requirement that there be a brief submitted as to the reason for the jury trial. These are the rules of that court as to how it handles jury trial requests. When that was denied, the issue was taken by appellant to the district court. It was denied there, and it came back to trial. That's when it went to trial in front of Judge Aper. So that issue was thoroughly reviewed at that time. When it was then remanded from the district court because of an error that was clearly made by Judge Aper, what Judge Aper did in the trial, he wrote his opinion. He inadvertently, or whatever it was, he did not write anything about two of the counts that were in the amended complaint. He had used the wrong complaint, so he had overlooked the two new counts, which are the fraud, fraudulent inducement counts. I mean, should the local rules sort of trump? I mean, if a party has a right to a jury trial under the Seventh Amendment, should the waiver of that be contingent upon your making sure you cross all the T's and dot all the I's that are required by a local rule? If he's asked for a jury trial, shouldn't the court have an obligation to rule on that motion under Rule 38 or 39 of the Federal Rules of Civil Procedure? Well, I'm going to be honest and say I'm not sure exactly how those rules of civil procedure mesh with bankruptcy rules. But my answer would be that the appellant had that ruling and had the opportunity when it was arguing to both the bankruptcy court and the district court that the waiver here should have been overlooked. And now you're back to what I think is the key issue. What is the rule that applies in this circuit and basically elsewhere with respect to any claim that misses deadlines for demanding a jury trial, whether it's in the rules where there's a deadline or in some other provision? And the cases here I think are pretty clear. The case that's relied upon in the brief, the Piedmont Bank case, is a case in which, in effect, the Fifth Circuit panel there was saying all of the people in the case, the judge, the clerk of the court, and the parties were all complicit in the error. That is, they all thought it was a jury trial. They were getting ready for a jury trial. And on the eve of the jury trial, they realized there's no jury demand except not from the party who wants it but by a party who had checked its own box for a jury trial on a form. And so they said, okay, the trial court said no jury trial. The Fifth Circuit said, under those circumstances, we're going to give the benefit of the doubt to the party that was relying in good faith on the fact that the clerk, the judge, and the other party all said it's going to be a jury trial. We don't have that. What we have is a party that wanted a jury trial and missed a deadline. And the rule in this circuit, as we understand it, is that mere inadvertence does not get you over the fact of waiver. In other words, you don't get a do-over just because we forgot. That's under Rule 38, though. It is. You don't get a do-over. But then the court can look or a motion can be filed referencing Rule 39, which gives the court broader discretion. And the Swartford case, I believe it is, for the Fifth Circuit and others, suggests that if you have issues that ought to be tried to a jury, then the court ought to exercise its discretion and set it on a jury trial calendar. What prejudice would either party have received if the jury trial was allowed? Today, there would be a lot of prejudice. And I'll talk about that at length if you want me to. This case has been going on since 2009, basically. So this is a longstanding dispute. I think my answer would be, Judge, that when there was a briefing to the district court with the attempt of appellant to withdraw his reference on the basis that he wanted a jury trial, and then there was a decision denying that by the district judge, that what you have there is, in my view, the equivalent of any other procedure that would be required or available. And you have the district court here exercising its discretion, and by the way, in doing that, affirming the bankruptcy court. And it seems to me that under those circumstances, we're back – we are where we are, which is this court now is reviewing on a standard of review for abuse of discretion the district court's decision to deny the jury trial on the grounds of a waiver, missing a deadline, and affirming a bankruptcy court that had previously ruled in that same regard. At the time, it was before the trial. It's hard for me to say there would have been prejudice then, because the trial had not been held. The original notice of trial setting said that it mattered to be heard, I believe, in April of whatever year that was. And then it was – the trial schedule was modified, and the trial didn't actually occur until July. So is that correct? I think that's right. I don't remember the date of the trial precisely, and I wasn't counsel at trial, but I think that's correct. Okay. But I think the issue for this court is what is the proper standard of review for a district court? And it's abuse of discretion, we think, based on the proper precedent, and we don't think it was an abuse of discretion for the district court to have done what it did. So we would ask for this case to come to an end finally and that there be an affirmance of the district court's decision. Thank you. Okay. Thank you, Mr. Page and Ms. Terraza. Your Honors, a brief rebuttal. First, I'd like to start with the standard of review. So there's no question here that the district court was sitting as an appellate court at the time it made its final order. It even says in its order, it references appellant and appellees, and then it reenters its prior orders that clearly say those are appellate orders. And the Wooley v. Faulkner case says that when a district court is sitting as an appellate court, that the Fifth Circuit would apply the same standard of review that the district court did. And here, the district court said that it was applying a de novo standard of review to both the findings of facts and the conclusion of the law. And so here, because it was sitting as an appellate court, the proper standard is actually a de novo. Also, Your Honor— Even on findings of fact? Yes, Your Honor. The facts with respect to what happened who—what happened when? Because the district court was sitting as an appellate court and it reviewed the findings of facts de novo, then yes, Your Honor, under the court's precedent, we believe that's the case. Also, Your Honor, the opposing counsel talked a lot about how the bankruptcy court's findings were amply supported by the record. I've gone through their briefs several times. I don't find those facts being supported. I don't find references to the record at all. I only find references to the bankruptcy court and its opinion. And that's not support for the bankruptcy court's opinion. It would be circular for that to happen. A great example of that is when opposing counsel says that the March lease was somehow—it was required that it only be entered into at the closing of the Asset Purchase Agreement and that it was an exhibit to that agreement. But didn't you say the date was blank? Yes, Your Honor. You said the date hereof is blank, so there's no date hereof. Your Honor, that's not what—it does not say the date referenced on the first page or the date referenced above. It says the date— I understand, but, I mean, it means the date that is in the context of that agreement. It means— It means the date that—the date—what date does it mean? It means the date of today. And the reason why that's important, Your Honor— The date of today. So it means even today it's the date of today? Your Honor, it means the date when it was signed. I'm sorry if that was confusing. The date that the contract was signed. And the reason why that's so important is that unlike the Asset Purchase Agreement, which was actually dependent on the mark's release— Well, the date hereof means—hereof refers to the document. What does hereof mean? It means the date it's executed. In the Cal State v. Dorado Exploration case, Your Honor, it talks about when the contract was executed and that that's the date hereof. And the Jefferson Standard case talks about anniversary hereof, and it specifically says that annually from today— Is it—do those cases have the blank—the blank space for the date off the contract? Well, Your Honor, actually the Cal State v. Dorado case doesn't talk about when the contract was dated at all. And the Jefferson Standard case actually says anniversary hereof means anniversary from today. It doesn't reference any sort of date—I'm sorry, Your Honor, may I finish? You can finish that. You've got 30 seconds. Yes, Your Honor. It doesn't mean any anniversary from the date of any date in the contract. Okay. Thank you, Your Honor. Thank you, sir. We'll call the next case of the day, and it's Daniel Valores v. Lubbock County Hospital.